UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THOMAS COX, et al., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :    Civil Action No. 09-1720 (GK) |
| | : |
| DISTRICT OF COLUMBIA, | : |
| | : |
| Defendant. | : |

MEMORANDUM OPINION

Plaintiffs, minor children and their parents and guardians,[1] seek to collect attorneys' fees and other costs incurred in bringing successful administrative actions under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq. Defendant is the Government of the District of Columbia. This matter is before the Court on Plaintiffs' Motion for Summary Judgment. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Plaintiffs' Motion for Summary Judgment is **granted**.

---

[1] Plaintiffs are Brenda Smith and Xane Smith, as parents/guardians of the minor child, B.S.; B.S., individually; Lena Johnson, as parent/guardian of the minor child, E.J.; and E.J., individually. Thomas Cox, Sr. and Dolores Lewis, as parents/guardians of the minor child, D.C.; D.C., individually; Karen Turley and Michael Turley, as parents/guardians of the minor child, R.T.; and R.T., individually, were all voluntarily dismissed on November 24, 2009 [Dkt. No. 5].

This is a case about attorneys' fees. What undergirds the request for attorneys' fees, and what caused the extensive legal work necessary to properly and effectively represent Plaintiffs' clients are two deeply distressing stories about the failure of the District of Columbia to provide absolutely necessary special education services to two children who desperately needed them.

The Smith case presents the most egregious situation. On September 7, 2007, a thirteen-year-old girl was reported to be verbally and physically aggressive in the classroom, argumentative, hostile, and attention-seeking with a host of academic problems. A plan was formulated to curb her behavior, but she was suspended for disruptive behavior. Her parents requested, in writing, a full evaluation for special education. The necessary comprehensive psychological report was not completed until a year later and the necessary Individual Education Program was not completed until almost thirteen months later, despite the fact that the child's classroom behavior continued to deteriorate during the entire school year. Finally, some fourteen-and-a-half months after the initial incident, when the child had a particularly violent classroom episode, she was admitted to the Psychiatric Institute and was not discharged until two weeks later. She returned to the same classroom setting--and was again violent, cursed her teachers, and refused to follow any instructions or directions. Some sixteen and a half months after the initial incident, she was suspended

from school for pushing a teacher, and was ultimately brought to court for similar conduct when it occurred again. Finally, some eighteen months after the initial incident, the child was determined to be eligible for special education services and received a disability certificate of Emotionally Disturbed.

It was only after the child's parents filed a Due Process Complaint, and received a full evidentiary hearing, that, thanks to the Hearing Officer, DCPS was ordered to place the child (after she lost two years of school[2]) at the High Road Middle School where she would receive the services she needed and to which she was entitled.[3]

The Johnson case, while less extreme, is equally heartbreaking. In that case, by December 4, 2008, it was recognized that this fourteen-year-old boy needed "an alternative placement" that was more restrictive and with students functioning at a level of mild mental retardation, but that he would have to be re-evaluated. That re-evaluation was done in a timely fashion and the original recommendation was re-affirmed. Thereafter, no progress was made in changing the boy's placement, his Individual Education Program was not revised, and various necessary tests and meetings related to finding an appropriate placement did not take place.

---

[2]    The Hearing Officer ruled on August 25, 2009.

[3]    The Hearing Officer's opinion in this case was impressively comprehensive, detailed, and thoughtful.

Four-and-a-half months after the initial determination that an alternative placement was needed, the child was suspended from school for disruptive behavior, which the school system determined was a manifestation of his disability.

Again, it was only after the child's parent filed a Due Process Complaint, and received a full evidentiary hearing, that, thanks to the Hearing Officer (not the Hearing Officer in the former case), DCPS was ordered to place the child, after he lost almost a full school year,[4] at the High Road Middle School where he would receive the services he needed and to which he was entitled.[5]

Both of these cases highlight not just the maddening inadequacies of the school system, but in relation to these Complaints, the enormously vital role that lawyers play in ensuring that their young clients obtain the educational enhancements that Congress has granted them so that they may go on to lead productive lives.

---

[4]    The Hearing Officer ruled on June 19, 2009.

[5]    Once again, the Hearing Officer wrote a careful and detailed Opinion.

## I. BACKGROUND

### A. Factual History[6]

#### 1. Plaintiffs Brenda Smith, Xane Smith, and B.S.

On June 22, 2009, Plaintiffs Brenda Smith and Xane Smith filed a Due Process Complaint on behalf of B.S., alleging that the District of Columbia Public Schools ("DCPS") had denied B.S. a free appropriate public education ("FAPE") under the IDEA. At that time, B.S. was a thirteen-year-old girl attending Macfarland Middle School. B.S. Decision 2.

The events giving rise to the Smiths' Due Process Complaint began on September 1, 2007. On that day, a Student Support Team ("SST") learned from B.S.'s teacher that B.S.'s classroom behavior was, among other things, verbally and physically disruptive, verbally aggressive, bullying, easily distracted, argumentative, hostile when criticized, attention-seeking, and easily frustrated. B.S.'s classroom behavior was accompanied by a host of academic issues, including declining grades, disorganization, incomplete assignments, failure to follow directions, poor study skills, and inability to work well with others. On September 14, B.S. was also described as having a short attention span, showing difficulty with

_____

[6] Unless otherwise noted, the facts set forth herein are drawn from the Parties' Statements of Material Facts Not in Dispute submitted pursuant to Local Rule 7(h) and from the Hearing Officer Decisions for B.S. ("B.S. Decision") [Dkt. No. 12-16] and E.J. ("E.J. Decision") [Dkt. No. 12-8].

sustained reading exceeding three minutes, and constantly moving about the classroom. Id. at 3-4.

On October 4, 2007, the SST formulated a plan for B.S., which included weekly counseling, support and materials as needed for B.S.'s course work, and daily monitoring forms to be completed by B.S.'s teacher. The SST plan also called for conducting a functional behavioral assessment ("FBA"), to produce a Behavior Intervention Plan ("BIP"). Nevertheless, B.S.'s problems persisted and she was suspended for five days. Id. at 4.

On November 19, 2007, Petitioners signed a written request that B.S. be evaluated for special education. B.S. was then referred to a Multidisciplinary Team ("MDT"). By November 26, 2007, the psychologist at Macfarland had the necessary release of information form from Brenda and Xane Smith and an SST Final Meeting Report requesting evaluation and referral to the MDT. On that same date, the psychologist relayed all relevant data to a DCPS special education specialist ("SEC"). Id.

By January 24, 2008, B.S. had failed four of the core classes for that quarter. On February 6, the psychologist at MacFarland sent a memorandum to the SEC, reminding him or her that B.S. continued to have problems at school, that the SST suspected disability, and that relevant data had been submitted to the SEC back in November 2007. The psychologist indicated that a meeting with B.S.'s parents had been scheduled for February 11, 2008, and

suggested that the SEC promptly schedule his or her own meeting with the Smiths to move forward with the eligibility process and to avoid litigation. Id. at 4-5.

On February 28, 2008, the MDT met to discuss B.S. and develop a Student Evaluation Plan, including psychological testing. Petitioners were present at this meeting. They informed the MDT that B.S. had been on medication for Attention Deficit Hyperactivity Disorder ("ADHD") for two years and insisted that B.S. be evaluated by the special education department. For the second time, Petitioners signed consent forms for this purpose. Id. at 5.

On April 3, 2008, the MDT met once again as a result of B.S.'s disruptive behavior. As it had done more than a month earlier, the MDT again developed a Student Evaluation Plan calling for psychological testing. This time, the MDT established a due date of May 30, 2008 for the psychological assessments. Id.

On August 13, 2008, more than two months after the MTD's deadline, the Department of Mental Health sent a letter to the SEC indicating that the Department of Mental Health Community Services Agency had diagnosed B.S. with Oppositional Defiant Disorder ("ODD") and ADHD. The letter also stated that B.S. had begun medication management in March 2008 and was under the care of a child psychiatrist.

On September 8, 2008, more than three months after the MTD's deadline, DCPS finally completed the comprehensive psychological report for B.S. Among other things, the report noted that B.S. was having social and emotional concerns relating to ADHD symptoms, that B.S. qualified for special education services based on poor performance in math testing, and that B.S. had the cognitive ability to perform at grade level, given accommodations to address restlessness and attention deficits. At that time, final recommendations were pending the convening of an MDT meeting and receipt of any outside reports from the parents. Finally, further testing was completed on September 24, 2008––nearly thirteen months after the initial incident of September 1, 2007. Id. at 5-6.

An initial individualized educational program ("IEP"), dated September 25, 2008, classified B.S. with a Specific Learning Disability ("SLD") and called for five hours per day of specialized instruction in the general education setting as well as thirty minutes per day of behavior support services. This IEP required that special education services be provided in a combination setting of general education and resources classroom. At the meeting for this IEP, on September 25, 2008, the MDT determined that ADHD was not impacting B.S.'s ability to learn. The MDT referred B.S. to the general education curriculum to develop a behavior intervention plan. Id. at 6-7.

On November 24, 2008, B.S. entered a classroom that was not hers and became angry when the teacher in that classroom asked her to leave. B.S. destroyed property, ruined work books, and threw a pencil sharpener, timer, and numerous books around the classroom. On the same day, B.S. was admitted to the Psychiatric Institute of Washington ("PIW"). She was discharged two weeks later on December 8, 2008, with a diagnosis of ODD, Mood Disorder Not Otherwise Specified ("NOS"), and ADHD, and given a prescription for medication. Id. at 7.

Upon return to school, on December 15, 2008, B.S.'s behavior again deteriorated. She exhibited frequent hitting and kicking, running away from the school, cursing, refusal to comply with authority, and disrespect toward teachers. The MDT convened again on December 18, 2008 to discuss B.S. The MDT determined that she was a danger to herself and others and recommended that she be considered for a change of school placement, once evaluations were completed. Not surprisingly, B.S. continued to have frequent, significant violent and disruptive outbursts throughout January 2009.[7] Id. at 7-8.

---

[7] One example of the type of conduct B.S. engaged in while the MDT continued to review her evaluations was described as follows by the Hearing Officer: "On 01/21/09, after another student read a poem about the teacher that [B.S.] had written, [B.S.] tore up the poem and offered the paper pieces to the teacher, [B.S.] ate food in class while waving the food bag in the teacher's face, [B.S.] took out a make-up kit in class and refused to put it away or give it to the teacher, [B.S.] continuously unlocked a door that the
(continued...)

On January 21, 2009, DCPS developed a BIP intended to improve B.S.'s lack of self-control and decrease her aggression. The BIP called for providing verbal praise for appropriate behavior and giving B.S. "the opportunity to demonstrate behavior." The BIP provided for additional computer time and food rewards as reinforcement. Inappropriate behavior would result in detention. Id. at 8.

The next day, January 22, 2009, B.S. was suspended for pushing a teacher. That day, the MDT met to review assessments from PIW. At that meeting, the school nurse informed the team that B.S. "would not comply with taking medication at school." The MDT intended to send the documents from PIW and DCPS's psychological evaluation "downtown" for determination as to whether B.S. met the criteria for Emotional Disturbance ("ED"). B.S.'s violent and disruptive conduct persisted through April 8, 2009, when she pushed a teacher twice, resulting in a court appearance.[8] Id. at 8-9.

On March 11, 2009, B.S. was determined eligible for special education services with a primary disability classification of Emotionally Disturbed ("E.D.") (as opposed to the prior

---

[7](...continued)
teacher had locked, and [B.S.]'s behaviors prevented the teacher from presenting the lesson to the class." B.S. Decision 8.

[8] The record gives no detail about the "court appearance." Based on this Court's long experience on the trial bench at Superior Court, it would appear that B.S. was brought in on a Juvenile Delinquency charge, although we know nothing about its disposition.

classification of Specific Learning Disability). As a result, B.S. was given a new IEP prescribing twenty-five and a half hours per week of specialized instruction outside of general education and two hours per day of behavioral support services in the general education setting. This IEP also provided for a dedicated aide and Extended School Year services. On the same day, the MDT determined that B.S. needed a more restrictive and intensive program for the emotionally disturbed. Between March 11, 2009 and the end of the school year, B.S.'s parents did not attend any MDT/IEP meetings where school placement for B.S. was discussed.[9] Plaintiffs were unaware of any new school placement for the following year. Id. at 9.

Therefore, on June 22, 2009--twenty-two months after the initial incident of September 1, 2007--Plaintiffs filed a Due Process Complaint alleging that DCPS had denied B.S. a FAPE. On August 20, 2009, after consideration of sixty-five documentary exhibits, four witnesses, and written closing statements, a Hearing Officer determined that:

> DCPS' failure to evaluate [B.S.] in a timely manner, failure to determine [B.S.] eligible for special education services as a student with a disability in a timely manner, failure to provide [B.S.] with an appropriate IEP and placement, failure to evaluate [B.S.] in all areas of suspected disability, and failure to

---

[9] The record does not indicate whether any such meetings actually took place and, if so, whether B.S.'s parents knew of them.

> address [B.S.]'s chronic and severe behavior
> problems with a FBA and effective BIP were all
> egregious violations of IDEIA, and as a result
> [B.S.] suffered much educational harm. As of
> the date of the due process hearing, DCPS
> still had not convened an IEP team meeting to
> discuss and determine an appropriate placement
> for [B.S.] for the upcoming 2009-1010 [sic]
> school year. All of the evidence taken
> together indicated that since at least March
> 2008, [B.S.] has been without appropriate
> evaluations, IEP, education placement and
> services, and [B.S.] has been denied a FAPE
> continuously since that time.

Id. at 20. The Hearing Officer ordered DCPS to immediately place and fund B.S.'s attendance at the High Road Middle School, including necessary transportation, pay for an independent clinical psychological evaluation of B.S. within ten days, conduct an FBA of B.S. withing thirty days, and convene an MDT/IEP meeting at High Road within fifteen days of the receipt of the independent evaluation reports and the FBA in order to revise the IEP as appropriate. Id. at 21.

On August 25, 2009, Plaintiffs submitted a petition for attorneys' fees and costs to DCPS in the amount of $26,525.28. On November 2, 2009, Defendant made a payment to Plaintiffs in the amount of $18,193.88, resulting in a $8,341.40 difference between what Plaintiffs believe they are owed for attorneys' fees and costs relating to B.S.'s petition and what Defendant has paid. Pls.' Statement of Facts ¶¶ 10-13. Defendant concedes that it owes Plaintiff Brenda Smith $47 in costs. Def.'s Response to Pls.'

Statement of Facts ¶ 13. Therefore, costs of $8,294.40 relating to B.S.'s case remain in dispute.

## 2. **Plaintiffs Lena Johnson and E.J.**

On May 8, 2009, Plaintiff Lena Johnson filed a Due Process Complaint on behalf of E.J., alleging that DCPS had denied E.J. a FAPE under the IDEA. At that time, E.J. was a fourteen-year-old boy and a 7th grade student at Brookland EC at Bunker Hill ("Brookland").

About five months before the filing of the Due Process Complaint, on or about December 4, 2008, an MTD at E.J.'s school met to discuss E.J.'s recent behavior and his need for an IEP. The team concluded that E.J. needed "an alternative placement" and that E.J. would have to be re-evaluated. E.J. Decision 3. DCPS conducted a social history with Lena Johnson on or about December 15, 2008, and further evaluated E.J.'s academic skills on or about February 9, 2009. At that time, DCPS did not conduct cognitive testing or re-evaluate E.J.'s speech and language skills. Finally, on or about February 17, 2009, a team met to further re-evaluate E.J. and resolved that "E.J. continued to be eligible for special education and related services as a student with Mental Retardation." The team reaffirmed its December 4, 2008 conclusion that E.J. required "a more restrictive placement with students functioning at a level of mild mental retardation with significantly delayed academics," which could not be provided at Brookland. Id.

In the months that followed, as E.J. remained at Brookland, Johnson repeatedly asked about a new placement for him, only to be told by the principal and others that no other placements were available. At the time the Due Process Claim was filed on May 8, 2009, more than five months had passed since E.J.'s December 4, 2008 evaluation, almost three months had passed since his February 17, 2009 re-evaluation, and his IEP had still not been revised to reflect his need for a more restrictive environment or full-time placement. Nor had a notice of proposed placement been sent to his parent. Nor had any MDT meeting occurred to move forward with a change of placement. Indeed, E.J. continued to attend school at Brookland pursuant to an IEP and educational placement that DCPS had already determined, on December 4, 2008, to be inappropriate to his needs. Id. at 4.

E.J. missed approximately fifteen speech therapy sessions and thirty hours of counseling during the 2008-2009 school year. Because of this failure, the Hearing Officer found that DCPS failed to provide the services required under E.J.'s already insufficient IEP. On or about April 28, 2009, E.J. was suspended from Brookland for eleven days. DCPS subsequently determined that the conduct for which E.J. was suspended was a manifestation of his disability. DCPS did not conduct an FBA. Id.

On June 19, 2009, after consideration of fifty documentary exhibits, four witnesses, and detailed written closing statements

requested by the Hearing Officer, that Hearing Officer concluded that DCPS's failure to re-evaluate E.J. in all areas of suspected disability, to develop a suitable IEP, to provide required services such as speech therapy and counseling, to provide an appropriate education placement, and to conduct an FBA and implement a behavioral intervention plan after E.J. was suspended from Brookland denied E.J. a FAPE. Consequently, the Hearing Officer ordered immediate placement and funding for E.J. at High Road as well as transportation, a meeting within thirty days of placement at High Road to revise E.J.'s IEP, funding for further independent evaluations of E.J.'s abilities, and, within sixty days, the functional behavioral assessment that DCPS had failed to conduct. Id. at 5-8.

On July 16, 2009, Plaintiffs submitted a petition for attorneys' fees and costs to DCPS, seeking $35,032.46. This original submission contained an erroneous entry and should have sought $23,152.46. Pls.' Statement of Facts ¶ 4. On September 23, 2009, Defendant paid Plaintiffs in the amount of $15,763.70, resulting in a difference of $7,388.76 between what Plaintiffs believe they are owed for attorneys' fees and costs relating to E.J.'s petition and what Defendant has paid. Pls.' Statement of Facts ¶¶ 3-7. Defendant concedes that it owes Plaintiff Lena Johnson $555.80 in costs. Def.'s Response to Pls.' Statement of

Facts ¶ 7. Therefore, costs of $6,832.96 relating to E.J.'s case remain in dispute.

### B. Procedural History

On September 10, 2009, Plaintiffs filed a Complaint [Dkt. No. 1] in this Court seeking the outstanding balance from their fee petitions. On December 1, 2009, Defendant filed its Answer [Dkt. No. 6]. On March 16, 2010, Plaintiffs filed a Motion for Summary Judgment [Dkt. No. 12]. On May 6, 2010, Defendant filed its Opposition [Dkt. No. 14]. On July 6, 2010, Plaintiffs filed their Reply [Dkt. No. 16].

## II. GOVERNING STANDARDS

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is, that it is "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, 473 F.3d at 333, quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of

the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

Section 1415(i)(3)(B) of the IDEA gives federal district courts the authority to "award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B).[10] Where the party seeking the attorneys' fees was the prevailing party, the court must assess whether the fees sought are reasonable. See Jackson v. District of Columbia, 696 F. Supp. 2d 97, 101 (D.D.C. 2010). Generally, a "reasonable" attorneys' fee is based on the reasonable number of hours expended multiplied by a reasonable hourly rate. See Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1324 (D.C. Cir. 1982); Cobell v. Norton, 231 F. Supp. 2d 295, 300 (D.D.C. 2002); Blackman v. District of Columbia, 59 F. Supp. 2d 37, 42 (D.D.C. 1999) (citing to Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).

The plaintiff bears the burden of demonstrating that both the hourly rate and the number of hours spent on particular tasks are reasonable. In re North, 59 F.3d 184, 189 (D.C. Cir. 1995); Jackson, 696 F. Supp. 2d at 101; Holbrook v. District of Columbia, 305 F. Supp. 2d 41, 45 (D.D.C. 2004). In order to show the

---

[10] Defendants concede that Plaintiffs are "prevailing parties" for the purposes of § 1415(i)(3)(B) and as such are entitled to an award of "reasonable attorneys' fees" under the statute. See Def.'s Statement of Facts ¶¶ 2, 9.

reasonableness of the hourly rates, "the plaintiff must submit evidence on at least three fronts: 'the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community.'" <u>Jackson</u>, 696 F. Supp. 2d at 101 (quoting <u>Covington v. District of Columbia</u>, 57 F.3d 1101, 1107 (D.C. Cir. 1995)). The plaintiff may satisfy the burden of demonstrating the reasonableness of hours spent "by submitting an invoice that is sufficiently detailed to 'permit the District Court to make an independent determination whether or not the hours claimed are justified.'" <u>Holbrook</u>, 305 F. Supp. 2d at 45 (quoting <u>Nat'l Ass'n of Concerned Veterans</u>, 675 F.2d at 1327).

## III. ANALYSIS

Defendant makes two basic objections to the fees sought by Plaintiffs. First, Defendant claims that Plaintiffs' counsel's hourly rates are unreasonable. Specifically, Defendant contends that Plaintiffs' reliance on the "<u>Laffey</u> Matrix" is not justified and that Plaintiffs should be reimbursed at the lower rates set by DCPS. Def.'s Opp'n 4-11. Second, Defendant argues that specific charges are unreasonable. <u>Id.</u> at 11-15. These claims will be addressed in turn.

### A.    The Hourly Rates Are Reasonable

Plaintiffs seek fees at an hourly rate of $400 for counsel Elizabeth T. Jester, Esq. and at an hourly rate of $125 for paralegal staff. Pls.' Mot. for Summ. J. 4. Plaintiffs rely on the

fact that these rates are below the rates specified in the <u>Laffey</u> Matrix, which sets out compensable billing rates for attorneys in the District of Columbia and has been adopted by the judges of this District in many cases. <u>Id.</u> at 4-6. Defendant objects on the ground that the DCPS's own "Guidelines for the Payment of Attorney Fees in IDEA Matters" ("DCPS Guidelines"), which limit rates for attorneys to $300 per hour and for paralegals to $90 per hour, are a more appropriate benchmark than the <u>Laffey</u> Matrix. Def.'s Opp'n 5-11.

The <u>Laffey</u> Matrix, approved long ago in <u>Laffey v. Northwest Airlines</u>, Inc., 572 F. Supp. 354, 371-72 (D.D.C. 1983), <u>rev'd on other grounds</u>, 746 F.2d 4 (D.C. Cir. 1984), provides a fee schedule for attorneys based on experience. <u>See</u> <u>Covington</u>, 57 F.3d at 1105. The <u>Laffey</u> Matrix has been updated periodically "to reflect current billing rates in the community." <u>District of Columbia v. Jeppsen</u>, 686 F. Supp. 2d 37, 38 n. 1 (D.D.C. 2010).

Defendant observes that the <u>Laffey</u> Matrix "was intended and designed for representation in federal civil litigation." Def.'s Opp'n 5; <u>see</u> <u>Covington</u>, 57 F.3d at 1103 (describing the <u>Laffey</u> Matrix as evidence of "prevailing market rates for comparably experienced attorneys handling complex federal litigation."). Defendant argues that Plaintiffs' Due Process Complaints were not complex and therefore related attorneys' fees should not be determined by the <u>Laffey</u> Matrix, and that the DCPS Guidelines provide a more suitable formula. <u>Id.</u> at 6-7. Defendant relies

entirely on <u>Agapito v. District of Columbia</u>, 525 F. Supp. 2d 150 (D.D.C. 2007) (Collyer, J.), which adopted the DCPS Guidelines in place of the <u>Laffey</u> Matrix in awarding fees based on IDEA litigation. <u>Id.</u> at 6.

Judge Ricardo M. Urbina, of this District Court, recently had occasion to consider precisely this argument, and rejected it. <u>See</u> <u>Jackson</u>, 696 F. Supp. 2d at 102-03. As he noted, "numerous judges in this district have applied <u>Laffey</u> rates in the context of fee awards arising out of IDEA administrative proceedings." <u>Id.</u> at 102 (citing <u>Kaseman v. District of Columbia</u>, 329 F. Supp. 2d 20, 25-26 (D.D.C. 2004) (Huvelle, J.); <u>Brown v. Jordan P.C.S.</u>, 539 F. Supp. 2d 436, 438 (D.D.C. 2008) (Leon, J.); <u>Bush ex rel. A.H. v. District of Columbia</u>, 579 F. Supp. 2d 22, 27 (D.D.C. 2008) (Urbina, J.); <u>Abraham v. District of Columbia</u>, 338 F. Supp. 2d 113, 124 (D.D.C. 2004) (Collyer, J.); <u>Nesbit v. District of Columbia</u>, Civ. No. 01-2429, at 1 (D.D.C. Nov. 4, 2003) (Order) (Kessler, J.)). Judge Urbina concluded that <u>Agapito</u> has "no binding effect on this court, [is] contrary to the weight of precedent and declined to address the decisions listed above, with which [it is] in conflict." <u>Jackson</u>, at 696 F. Supp. 2d at 102. This Court totally agrees with his reasoning.

Moreover, Defendant's claim that B.S. and E.J.'s hearings were "uncomplicated" is absurd, as any reading of the comprehensive decisions by the two Hearings Officers in these cases demonstrates.

<u>See</u> Def. Opp'n 6. In B.S.'s case, it took nearly two years––which included a suspension from school and a two-week stay in a psychiatric hospital––and a hearing with sixty-five documentary exhibits, four witnesses, and written closing statements to obtain an order forcing DCPS to provide desperately needed treatment and educational assistance. <u>See</u> B.S. Decision 2-3. As for E.J., it took more than seven months and a hearing with fifty documentary exhibits, four witnesses, and written closing statements to obtain a ruling that would, hopefully, provide the help that E.J.'s MDT made clear was needed. <u>See</u> E.J. Decision 5-8.

<u>Agapito</u> involved no such complex matters, "no pre-hearing interrogatories or discovery, no production of documents or depositions, no psychiatrists or psychologists testifying about learning disabilities, no briefings of intricate statutory or constitutional issues, no pre-trial briefings, no lengthy hearings, no protracted arguments, and few, if any, motions filed." 525 F. Supp. 2d at 152.

Finally, Defendant offers no reasoned defense for its own Guidelines. The affidavit of Quinne Harris-Lindsey [Dkt. No. 14-4] cites no justification for imposing a $300 per hour cap on all IDEA attorneys fees, or for rejecting the <u>Laffey</u> Matrix, which has been so widely accepted, and no empirical evidence of prevailing attorney rates in Washington, D.C. Nor is there any evidence that these Guidelines went through any kind of process for the issuance

of administrative regulations, where public comment could be submitted and considered. <u>See</u> D.C. Code § 2-505 (setting out procedures for notice and comment rulemaking).

It is also worth noting that in order to handle special education cases effectively, counsel must know far more than IDEA law in order to cope with the obstructive and delaying practices of DCPS. Sad to say, to be effective--i.e., to get services, education, and treatment for their young clients--it is essential that counsel understand the bureaucratic workings of that system, know competent and caring individuals in that system who can break logjams and obtain necessary evaluations, reports, and materials, and then assure provision of whatever FAPE is deemed appropriate. To accomplish this goal takes diligence, perseverance, persuasiveness, and negotiating and inter-personal skills--as well as the traditional legal skills expected of any competent lawyer.

In short, application of the <u>Laffey</u> Matrix is appropriate here.

### 1. Elizabeth Jester's Rate Is Reasonable

The <u>Laffey</u> Matrix sets out an hourly rate of $465 for work performed in 2008-2009 by attorneys with more than twenty years of experience. Plaintiffs seek an hourly rate of only $400 for Jester, who has practiced law for over twenty-nine years. <u>See</u> Pls.' Mot. for Summ. J. 5. Moreover, Plaintiffs have amply demonstrated Jester's experience and reputation. <u>See</u> <u>Covington</u>, 57 F.3d at 1107.

In addition to Jester's lengthy experience handling children's rights issues and extensive experience litigating special education cases, she teaches CLE courses on special education and has served as an instructor for new special education attorneys on the D.C. Superior Court CCAN panel. Jester has served on the D.C. Superior Court Family Division panel of attorneys approved to accept Special Education Attorney appointments since its inception and has litigated numerous cases both as appointed and retained counsel in D.C. Superior Court, the Federal District Court for the District of Columbia, and the Court of Appeals for the District of Columbia. See Jester Decl. [Dkt No. 12-1] ¶ 4-6, at 2-4. Given this experience, $400 is a reasonable rate for Jester's work on these matters.

### 2. Mary Williams' Rate Is Reasonable

The rate of $125 sought for Mary Williams' work as a paralegal is below the rate of $130 specified in the Laffey Matrix. For the reasons cited above, $125 is a reasonable rate for Williams' work as a paralegal.

### B. Plaintiffs' Charges Are Reasonable

Defendant makes three challenges to the reasonableness of specific charges. In particular, Defendant claims that (1) certain clerical and non-professional work should not be compensated at an attorney's rate, (2) charges for legal work performed far before the administrative hearing are not compensable, and (3) certain of

Plaintiffs' entries are too vague to merit compensation. <u>See</u> Def.'s Opp'n 11-15. Each will be considered individually.

### 1. Supposedly "Clerical" Activities Are Reasonably Charged at Attorney Rates

Defendant objects to the attempt by Plaintiffs' counsel to charge attorney rates for certain work performed, "such as calls and letters to request records from a school." Def.'s Opp'n 12. Defendants rely on <u>Bailey v. District of Columbia</u>, 839 F. Supp. 888 (D.D.C. 1993), for the proposition that clerical fees may only be permitted where an attorney is a solo practitioner. Def.'s Opp'n 11. Defendants also argue that the activities reimbursed for in <u>Bailey</u> were less "elementary" than the tasks at issue here. <u>Id.</u> at 11-12.

However, the court in <u>Bailey</u> specifically recognized that attorneys "operating either as solo practitioners or <u>in small firms</u>, often lack the resources to retain a large staff of junior lawyers who could handle such tasks more economically" and that "[d]enying plaintiffs compensation for these tasks would unfairly punish plaintiffs and their counsel for not staffing this case as if they had the manpower of a major law firm." 839 F. Supp. at 891 (emphasis added); <u>see also</u> <u>Jeppsen</u>, 686 F. Supp. 2d at 39. Here, Plaintiffs' counsel had no full-time paralegal or any other staff to assist in these tasks. Supplemental Aff. of Elizabeth T. Jester, Esq. [Dkt. No. 16-1] ¶ 4. Further, these tasks cannot be dismissed as merely "elementary," given that the "[p]ersonnel at McFarland

-24-

were obstructionist and refused to respond to numerous requests for the records to the point that . . . counsel had to drive to the school to personally review the records and obtain a copy." <u>Id.</u> For these reasons, it was appropriate and reasonable to allow payment of these charges at an attorney's rate.

### 2. Charges Relating to Activities in Advance of Hearings Are Reasonable

Defendant next challenges certain charges made relating to B.S.'s case on the ground that billing entries from April 15, 2009 through May 14, 2009 "cannot possibly be determined to be related to the subsequent hearing," which occurred on August 4, 2009. Def.'s Opp'n 13. Defendant contends that "in the absence of some extraordinary explanation detailing how the actions directly related to the administrative proceeding," such charges must be deemed unreasonable. <u>Id.</u>

Defendant cites no caselaw supporting imposition of such a requirement. Nor could it. Indeed, one of the cases Defendant cites directly contradicts its claim. In <u>Lax v. District of Columbia</u>, the court found that a year in advance of a hearing "is an entirely reasonable window of time to be engaging in productive work that will result in a favorable administrative decision" based merely on a showing by the plaintiff that each charge was tied to a particular hearing. Civ. No. 04-1940, 2006 WL 1980264, at *4 (D.D.C. July 12, 2006). Plaintiffs have amply shown that charges for work done less than five months in advance of what was a very

complicated hearing are reasonable. <u>See</u> Supplemental Aff. of Elizabeth T. Jester ¶ 2 (detailing counsel's efforts to obtain and review records).

Defendant's objection here is particularly unpersuasive in light of the fact that the reason attorneys often have to conduct so much work in advance of filing a Due Process Complaint is because employees of the District of Columbia school system will not readily provide evaluations and reports, which are not only essential but to which plaintiffs are entitled. <u>See</u> <u>Id.</u> Plaintiffs' charges are not made unreasonable when caused by Defendant's own delays. Hence, payment of the challenged charges relating to work in advance of B.S.'s hearing is reasonable and appropriate.

### 3. Supposedly "Vague" Charges Are Reasonable

Finally, Defendant argues that entries with descriptions such as "Phone with B. Smith, client" are too vague to determine whether they are reasonably related to the Due Process Complaint. Def.'s Opp'n 14.

To be sufficient, an invoice "need not present the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." <u>Nat'l Ass'n of Concerned Veterans</u>, 675 F.2d at 1327 (<u>quoting</u> <u>Copeland v. Marshall</u>, 641 F.2d 880, 891 (D.C. Cir. 1980)). Plaintiffs' entries make it clear that counsel was communicating with her clients regarding their Due Process Complaints. Defendant's criticisms are

of the "nit-picking" variety which this Circuit has warned against. See Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1337-38 (Tamm, J., concurring) ("Neither broadly based, ill-aimed attacks, nor nit-picking claims by the Government should be countenanced."). The charges Defendant has described as vague or lacking specificity are reasonable and appropriate.

**IV. CONCLUSION**

Plaintiffs' Motion for Summary Judgment is **granted**. Pre-judgment interest is awarded, since Defendant did not contest Plaintiffs' request in its Opposition. See Kattan by Thomas v. District of Columbia, 995 F.2d 274, 279 (D.C. Cir. 1993); SEC v. Bilzerian, Civ. No. 89-1854 (SSH), 1993 WL 542584, at *1 (D.D.C. June 25, 1993).


                                         /s/
December 9, 2010                 Gladys Kessler
                                 United States District Judge


**Copies via ECF to all counsel of record**